IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

**DAKOTA COCHRAN,**

         **Plaintiff,**          Case No.

**v.**          Judge
         Magistrate Judge
**CITY OF LA VERGNE, TENNESSEE,**

         **JURY DEMAND**

         **Defendant.**
_____/

Defendant City of La Vergne ("La Vergne") violated the ADAAA when it refused Plaintiff Dakota Cochran's ("Mr. Cochran") accommodation requests concerning non-essential functions of his job. Further, La Vergne violated the ADAAA when it engaged in a pattern of discrimination and created a hostile work environment due to his disability, including name calling and forcing him to perform tasks that triggered panic attacks and caused severe physical manifestations of his disorder. La Vergne then retaliated against Mr. Cochran when it terminated him after he made multiple complaints of disability discrimination and requested accommodation. Thus, Mr. Cochran brings claims of discrimination and retaliation under the Americans with Disabilities Act, as amended, the Tennessee Disability Act, and Tennessee common law.

**PARTIES**

1. Plaintiff, Dakota Cochran, ("Plaintiff" or "Mr. Cochran") is a citizen and resident of La Vergne, Rutherford County, Tennessee, and a former employee of Defendant.

2. Defendant City of La Vergne is a Tennessee governmental entity organized and existing under the laws of the State of Tennessee. At all relevant times, the City of La Vergne employed Plaintiff. At all material times, Defendant has been an employer as defined by the ADA, 42 U.S.C. § 12111.

1

3. Plaintiff is a qualified individual with a disability under 29 C.F.R. §1630.2(g) and (h)(2).

4. At all material times, Defendant has been an employer as defined by the Tennessee Disabilities Act, T.C.A. § 8-50-103.

**JURISDICTION AND VENUE**

5. This is an action for unlawful employment practices brought under the Americans with Disabilities Act 42 U.S.C. §§ 12101 *et seq.* ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA") (Counts I - II) and the Tennessee Disability Act, T.C.A. § 8-50-103 ("TDA") (Counts III and IV).

6. The Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(4), and 1367(a). Venue is proper under 28 U.S.C. § 1391.

7. Plaintiff complied with all conditions precedent to the filing of his claims pursuant to 42 U.S.C. § 12101 *et seq.*, to wit: a charge of discrimination was filed with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the unlawful employment practice; the EEOC issued Plaintiff a Notice of Right to Sue for the charge and this action was commenced within 90 days of receipt of Notice of Right to Sue.

**FACTS**

8. Plaintiff, Dakota Cochran, was employed by La Vergne as a Laborer on the La Vergne Public Works Streets team from February 1, 2022, until his termination on September 27, 2022.

9. Mr. Cochran is a qualified individual with a disability under 29 C.F.R. §1630.2(h)(2). In particular, Mr. Cochran has a mental health disability, anxiety, PTSD, and a

2

panic disorder that requires medication and ongoing treatment. This disability affects his nervous and cardiovascular systems and the major life activities of working and sleeping, among others.

10. As a result of his disability and a traumatic childhood incident, Mr. Cochran also suffers from Acrophobia, a severe fear of heights, which also affects his nervous and cardiovascular systems and the major life activities of working and sleeping, among others.

11. In his role as Laborer, Mr. Cochran performed a variety of semi-skilled and skilled maintenance work, including operating a variety of equipment to maintain and replace street and storm drainage facilities and systems, and providing "street-related services to residents, industrial and commercial customers."

12. As a condition of his employment, Mr. Cochran had to pass a pre-employment health screening. On his Pre-Employment Health Screening forms, Mr. Cochran noted that he is prescribed and regularly takes Zoloft, an anti-anxiety medication.

13. Mr. Cochran was one member of a team of Laborers that performed the essential duties and responsibilities of the Streets team during his shift.

14. According to La Vergne's Public Works - Streets Laborer job description, dated May 2, 2022, Laborers perform the following essential functions:

- Assists with the planning, scheduling and implementation of construction, maintenance, and operation and construction activities designed to provide quality street and drainage service.
- Assists in the training of lower level employees performing the duties of maintenance, construction and repair of street and storm drainage facilities.
- Inspects and/or repairs streets, drainage systems and storm sewer systems at frequent intervals to insure that all aspects of the systems are functioning properly.
- Maintains a variety of records relating to inspections, maintenance activity, repairs, etc.
- Determines the locations of gas, telephone, power, television, water and sewer lines from the appropriate sources prior to excavation.
- Responds to complaints and service requests regarding pot holes, flooding, right-of-way problems, signals, street lights or related issues; evaluates situation; explains finding to supervisor.

3

- Mows and maintains public rights-of-way.
- Operates a street sweeper.
- Contacts residents and business owners in area where services or access may be discontinued and explains when access or services will be restored.
- Insures the proper maintenance of equipment and tools by cleaning and checking equipment and tools after use.
- Drives trucks of various sizes and weights in the loading, hauling and unloading of various equipment, gravel and sand.
- Performs routine inspection and preventive maintenance on assigned equipment and refers defects or needed repairs to supervisor.
- Cleans equipment.
- Operates light and medium-sized construction and power equipment, such as mechanized broom, jetter/inductor truck or backhoe/loader.
- Performs all duties in conformance to appropriate safety and security standards.
- Performs all required labor involved in construction and maintenance projects as part of a crew, including pavement cutting, ditch digging, manhole and line cleaning, main and pipe repair, laying and backfilling. Cuts, fits, lays, repairs, taps, cleans and flushes storm water mains, pipe, gates and fittings on repair of lines and fire hydrants.
- Operates a variety of power construction and maintenance equipment used in the street department.
- Performs other duties as required.

15. Mr. Cochran never responded to any complaints individually.

16. Most of the complaints that Mr. Cochran and his fellow shift Laborers responded to included filling potholes and trash pickup.

17. On occasion, though rarely, Mr. Cochran's team responded to complaints regarding street light repairs in which a "bucket truck" was required for the repair.

18. A "bucket truck" is a utility truck fitted with a hydraulic pole that has a bucket at its end, in which a person could stand and be lifted in order to perform a repair.

19. According to La Vergne's Public Works - Streets Laborer job description, the work environment is described as working in outside weather conditions, and that although an employee could work "near moving mechanical parts and in high precarious places," these tasks would only occur occasionally.

20. Additionally, of the seventeen (17) essential functions of Mr. Cochran's position, working in high places or on the bucket truck are not listed in the "Essential Duties and Responsibilities" portion of the job description.

21. At the time of his employment, Mr. Cochran communicated to his supervisor, Douglas Oakley, that he suffers from Acrophobia, which stems from his anxiety and panic disorder. He requested that he not be assigned to go up in the bucket on the bucket truck, and instead requested assignment on the ground assisting the other laborers.

22. Although La Vergne initially informed Mr. Cochran that it could accommodate this request, this accommodation was not honored.

23. By March 2022, Mr. Cochran's co-workers and supervisor, Mr. Oakley, began a pattern of discrimination, creating a hostile work environment, as they continued to refer to Mr. Cochran as "Bucket Man" and bullied him regarding his fear of heights and inability to be assigned to the bucket.

24. This behavior escalated on or around April 2022, when Mr. Cochran's team was assigned to repair some of La Vergne's traffic lights for which a bucket truck would be required.

25. Despite his request for accommodation, Mr. Oakley forced Mr. Cochran to put on the required harness, enter the bucket, and be hoisted in the air to perform the repair.

26. Mr. Cochran did not have to be assigned this task. Other laborers on Mr. Cochran's team could have been in the bucket, and Mr. Cochran could have been assigned to one of the ground level jobs required for the repair.

27. While in the air, Mr. Cochran's panic, anxiety, and acrophobia disorders were triggered, resulting in him having a panic attack, shaking in the bucket, and requesting to be brought back down to ground level.

28. Despite this incident, Mr. Oakley continued to try and force Mr. Cochran to go into

the bucket and be lifted to perform repairs.

29. Mr. Oakley exclusively selected Mr. Cochran to perform the bucket duties over the other laborers, despite Mr. Cochran's disability and request for accommodation. Each time, Mr. Cochran protested due to his disability.

30. As a result of this hostile work environment, discrimination, and retaliation, on or around May 3, 2022, Mr. Cochran suffered a severe panic attack at the thought of returning to work. He went to the Emergency Room and was informed that this panic attack was caused by his anxiety.

31. Mr. Cochran took the following two days off work. However, when he attempted to return to work, he suffered another panic attack so severe that he was physically unable to move.

32. Mr. Cochran informed La Vergne that he could not come to work and would again be going to the Emergency Room.

33. Mr. Cochran contacted Andrew Patton, Human Resources, and informed him of his disability and his medical treatment, which now included testing on Mr. Cochran's heart due to the severity of his physical symptoms from the panic attacks. Mr. Cochran was experiencing stroke-like symptoms due to the panic attacks triggered by La Vergne's hostile work environment.

34. Mr. Patton approved Mr. Cochran for an unpaid medical leave of absence from May 2022 until September 2022.

35. Mr. Cochran was then approved for Short-Term Disability benefits through La Vergne's third party provider, UMR, from May 4, 2022, until June 27, 2022.

36. On July 8, 2022, UMR contacted Mr. Cochran, notifying him that he would no longer continue to receive Short-Term Disability benefits if he could not provide additional documentation from his treating physicians by August 21, 2022.

37. On August 17, 2022, Mr. Cochran contacted Mr. Patton to provide him with further

6

Case 3:23-cv-00428    Document 1    Filed 04/28/23    Page 6 of 14 PageID #: 6

details regarding his medical leave request, including that Mr. Cochran experienced a flare up of his panic disorder and PTSD and that he was experiencing lingering effects.

38. Mr. Cochran notified Mr. Patton that when he was hired, he spoke with Mr. Oakley about his fear of heights, which is a part of his panic disorder and PTSD and that heights are a trigger.

39. Mr. Cochran also notified Mr. Patton that on multiple occasions he was forced into a bucket and was bullied by Mr. Oakley and his coworkers due to his disability, including the regular use of the nickname, "bucket man." Further, he informed Mr. Patton that his work-induced panic attacks were ongoing, and he had developed stroke-like symptoms as a result, requiring Emergency Room visits and visits to his doctors and psychiatrist.

40. Upon information and belief, La Vergne did not investigate Mr. Cochran's complaints of discrimination and retaliation.

41. Despite Mr. Cochran's many requests to his physician to complete the requested medical leave paperwork, his physician did not and UMR denied Mr. Cochran's benefits.

42. On August 22, 2022, Mr. Patton responded to Mr. Cochran's email stating that UMR notified Mr. Patton that it had not received documentation. Mr. Patton stated, "I have not received anything from the doctor either. You *might* want to follow up with your doctor on that request." (emphasis added).

43. On this same day, Mr. Cochran responded to Mr. Patton, informing him that he had been trying to push his doctors to complete the paperwork but was not having success.

44. It was not until September 2, 2022, that Mr. Patton contacted Mr. Cochran stating that because Mr. Cochran's Short-Term Disability benefits were denied, La Vergne needed to begin "the work of returning" and provided Mr. Cochran with Return to Work documents for his physician to complete.

45. Despite his awareness of Mr. Cochran's issues with his physicians, Mr. Patton provided Mr. Cochran one week, by 5:00 pm on September 9, 2022 (including the weekend), for Mr. Cochran's physicians to complete the requisite paperwork.

46. On September 6, 2022, Mr. Cochran filed a Charge with the EEOC alleging disability discrimination and retaliation.

47. On September 8, 2022, Mr. Cochran contacted Mr. Patton to request an extension, which Mr. Patton approved through September 16, 2022.

48. On September 16, 2022, Mr. Cochran emailed Mr. Patton notifying him that Mr. Cochran had provided his doctors with the paperwork, that it was still not ready, but that he had been contacting his physicians multiple times per day and was informed that the doctor was not in that day.

49. On September 21, 2022, Mr. Patton responded that he "hate[s] that [Mr. Cochran has] had trouble getting the return to work paperwork from the doctor," but La Vergne needs to "make progress towards [his] return to work based on an approved accommodation or need to fill [his] role if [he is] unable to return."

50. The next day, Mr. Cochran emailed Mr. Patton that Mr. Cochran's physician informed him that they faxed the required documentation the week before.

51. When Mr. Patton replied that the paperwork had not been received, Mr. Cochran requested Mr. Patton's fax number.

52. Mr. Patton never replied.

53. La Vergne failed to engage in an interactive process with Mr. Cochran directly about the accommodations his physician recommended to him to allow him to return to work. La Vergne did not ask Mr. Cochran directly what his anticipated return to work date would be.

54. Instead, on September 27, 2022, La Vergne terminated Mr. Cochran for "attendance

and lack of participation in leave process."

55. Mr. Patton noted in his letter of termination to Mr. Cochran that he was being terminated in part due to the denial of Short-Term Disability leave by UMR. Mr. Patton also admits in this letter that Mr. Cochran notified him of the issues with his provider and that he was actively attempting to get paperwork completed by his physician.

## Count I
## Violation of ADA/ADAAA- Disability Discrimination

56. Plaintiff restates and incorporates herein the above paragraphs in their entirety.

57. Pursuant to the ADAAA, an individual is considered to have a disability if he has a mental disorder that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such impairment. Plaintiff was a qualified individual with a disability as he had multiple mental health disorders that affected his nervous and cardiovascular systems and were an impairment that substantially limited him in one or more major life activities.

58. Plaintiff was also regarded as disabled.

59. Plaintiff was subjected to a hostile work environment on the basis of his disability, forced on medical leave, and terminated because of his disability and/or Defendant's failure to accommodate his disability.

60. Plaintiff could perform the essential functions of his job with an accommodation of additional medical leave or to not be assigned to getting in the bucket on the bucket truck.

61. Plaintiff was subjected to a discriminatory hostile work environment, discriminated against, and eventually terminated due to his disability, his engagement in protected activity, and his requests for a reasonable accommodation.

62. Plaintiff's supervisor repeatedly forced him to perform a non-essential function of the Laborer position, despite his request for accommodation, causing Plaintiff to suffer severe

9

physical manifestations of his disability and to need extended medical leave.

63. Plaintiff also requested a reasonable accommodation of an extension of his medical leave, however, Defendant failed to engage in an interactive process with him and ultimately terminated him.

64. As a direct and proximate result of Defendant's unlawful acts, Plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and lost earnings and benefits.

65. As a result, Plaintiff is entitled to recover his damages, including lost wages and benefits, compensatory and punitive damages, attorneys' fees, costs, interest, reinstatement, front pay and benefits, and any other legal and equitable relief to which he may be entitled.

## Count II
## Violation of ADAAA- Retaliation

66. Plaintiff restates and incorporates herein the foregoing paragraphs.

67. It is federal public policy and law under the Americans with Disabilities Act that employees must be able to exercise their rights without fear of reprisal or penalty from an employer.

68. Plaintiff engaged in protected activity under the ADA when he requested an accommodation, complained of disability discrimination and retaliation, and filed an EEOC charge. Such actions by the Plaintiff are statutorily protected activities under ADAAA.

69. In violation of the ADAAA, Defendant retaliated against Plaintiff when it denied his accommodation requests and then terminated his employment.

70. As a direct and proximate result of Defendant's unlawful acts, Plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and lost earnings and benefits.

## Count III
## Violation of TDA- Disability Discrimination

71. Plaintiff restates and incorporates herein the above paragraphs in their entirety.

72. Pursuant to the TDA, an individual is considered to have a disability if he or she has a physical or mental impairment that substantially limits one or more major life activities.

73. Plaintiff was a qualified individual with a disability.

74. Defendant discriminated against Plaintiff on the basis of his disability, in violation of the TDA, that culminated in his termination.

75. Plaintiff was discriminated against and eventually terminated because of his disability and his complaints of disability discrimination and retaliation.

76. Further, Plaintiff was subjected to a hostile work environment by his supervisor and coworkers, resulting in physical manifestations of his disability which required ongoing medical treatment.

77. As a direct and proximate result of Defendant's unlawful acts, Plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and lost earnings and benefits.

78. As a result, Plaintiff is entitled to recover his damages, including lost wages and benefits, compensatory and punitive damages, attorneys' fees, costs, interest, reinstatement, front pay and benefits, and any other legal and equitable relief to which he may be entitled.

## Count IV
## Violation of TDA- Retaliation

79. Plaintiff restates and incorporates herein the foregoing paragraphs.

80. It is the public policy and state law of Tennessee that employees must be able to exercise their rights under state law without fear of reprisal or penalty from an employer.

81. Plaintiff objected to and protested disability discrimination in the workplace. Such

actions by the Plaintiff are statutorily protected activities under TDA.

82. In violation of the TDA, Defendant retaliated against Plaintiff by terminating his employment in retaliation for exercising his rights under the TDA.

83. Defendant retaliated against Plaintiff because of his protected activity by taking adverse action against Plaintiff. As a result of Plaintiff's protected activity, i.e. multiple complaints of disability discrimination, Defendant took adverse employment actions against Plaintiff for a pretextual reason.

84. As a direct and proximate result of Defendant's unlawful acts, Plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and lost earnings and benefits.

## COUNT V
**(Intentional Infliction of Emotional Distress)**

85. Plaintiff restates and incorporates herein the allegations in the above paragraphs.

86. Defendant engaged in extreme and outrageous conduct toward Plaintiff.

87. The harassing conduct on the basis of Plaintiff's disability should not be tolerated in our society and intended to and did cause serious physical and mental injury.

88. Defendant's harassment of and eventual termination of Plaintiff inflicted severe emotional distress on Plaintiff.

89. Defendant intended to cause emotional distress or recklessly disregarded whether its conduct would cause emotional distress.

90. Defendant's intentional conduct caused Plaintiff severe emotional distress resulting in damages.

## COUNT VI
**(Negligent Infliction of Emotional Distress)**

91. Plaintiff restates and incorporates herein the allegations in the above paragraphs.

92. Defendant engaged in extreme and outrageous conduct toward Plaintiff. The harassment inflicted on Plaintiff was negligent, reckless, outrageous, not conduct tolerated in our society, and without regard for and did cause serious physical and mental injury.

93. Defendant's conduct inflicted severe emotional distress on Plaintiff.

94. Defendant negligently caused emotional distress or recklessly disregarded whether its conduct would cause emotional distress.

95. Defendant's conduct caused Plaintiff severe emotional distress resulting in damages.

## RELIEF REQUESTED

Plaintiff respectfully requests:

1. A jury trial;

2. Back pay and damages for lost benefits, insurance and reimbursement for medical costs due to the loss of his insurance;

3. Reinstatement and/or front pay;

4. Compensatory damages for embarrassment, humiliation, stress, anxiety, inconvenience, and loss of enjoyment of life;

5. Punitive damages;

6. Attorneys' fees and expenses;

7. Prejudgment interest and, if applicable, post-judgment interest; and

8. Such other and further legal or equitable relief to which he may be entitled under the ADAAA, the TDA, and any other statutory or common law.

Respectfully submitted,

*s/ Heather Moore Collins*
Heather Moore Collins (BPR #026099)
Ashley Shoemaker Walter (BPR #037651)
Caroline Drinnon (BPR #037016)
HMC Civil Rights Law PLLC
7000 Executive Center Drive, Suite 320

Brentwood, TN 37027  
Phone: (615) 724-1996  
Fax: (615) 691-7019  
heather@hmccivilrights.com  
caroline@hmccivilrights.com  
ashley@hmccivilrights.com